**William ANDREWS,**
**Petitioner–Appellant,**

v.

**Eldon BARNES, Warden, Utah State**
**Prison, Respondent–Appellee.**

No. 89–C–0649–S.

United States District Court,
D. Utah, C.D.

Aug. 3, 1990.

Gordon G. Greiner, Mary V. Stolcis, Sandra R. Goldman, Patricia A. Rooney, Hol-

land & Hart, Denver, Colo., Timothy K. Ford, MacDonald, Hoague & Bayless, Seattle, Wash., Robert M. Anderson, Hansen & Anderson, Salt Lake City, Utah, for petitioner-appellant.

Robert R. Wallace, T.J. Tsakalos, Daniel S. McConkie, Hanson, Epperson & Smith, Salt Lake City, Utah, for respondent-appellee.

SAM, District Judge.

This matter is before the court on Petitioner William Andrews' Objection to the magistrate's Report and Recommendation (R & R) dated May 10, 1990.[1] In that comprehensive R & R the magistrate recommended that this court deny Mr. Andrews' supplemental petition. Mr. Andrews objected to the R & R [2] and, as part of that objection, requested that this court conduct extensive evidentiary hearings in connection with a *de novo* review and hearing on the objection.

The applicable statute (28 U.S.C. § 636) requires this court to review the R & R under a *de novo* standard, but does not require this court to conduct additional evidentiary hearings.[3] *See* Ruling and Order, dated August 18, 1989. After careful review of the lengthy record, including extensive written memoranda, and thorough analysis of the facts and applicable law outlined by the magistrate in his R & R, the court has determined that further oral argument is not necessary.

---

1. A detailed outline of the procedural history of this case is set forth in pages two through five of the Report and Recommendation of the magistrate dated August 17, 1989.

2. Mr. Andrews has filed several motions in this court pertaining to the May 10 R & R which include: Petitioner's Objections to Report and Recommendation of the Magistrate, filed May 21, 1990; Petitioner's Motion to Affirm Portions of the Report and Recommendation of the Magistrate, filed May 21, 1990; Petitioner's Motions Regarding *De Novo* Review, filed May 21, 1990; Petitioner's Motion Regarding Magistrate's Second Report and Recommendation and Tenth Circuit Decision Respecting the Court's Continuing Jurisdiction, filed June 11, 1990; Petitioner's Memorandum in Response to Order of June 8, 1990, and in Support of Motions Respecting *De Novo* Review, filed June 25, 1990; and, most

recently, Petitioner's Supplemental Proffer Supporting Motion for Evidentiary Hearing and Discovery, filed July 30, 1990.

3. Rule 5(g) of the Civil Rules of Practice of the United States District Court for the District of Utah is consistent with 28 U.S.C. § 636 in that it permits this court to exercise discretion as to whether to allow oral argument on any given matter:

> Oral arguments on motions. Requests for oral arguments on motions shall be granted only at the discretion of the court. The court, on its own initiative may set any motion for oral argument or hearing. If oral argument is to be heard, the motion shall be promptly set for hearing. Otherwise, motions shall be submitted and determined on the written memoranda of the parties.

The transcripts of the evidence before the magistrate have been examined and assessed for credibility. Based on an independent, *de novo* review of the evidence, *Gee v. Estes*, 829 F.2d 1005 (10th Cir.1987), the court concludes that the magistrate's findings one through nine on pages 1505–06 and findings one through nine on pages 1521–22 of the May 10 R & R are correct and hereby adopts those findings as its own.

This Order will now address the relevant legal issues:

Respondents claim this court should deny any relief to Mr. Andrews due to an abuse of the writ of habeas corpus. The magistrate, in the May 10 R & R, concluded that petitioner's argument with regard to the peremptory challenge of the only black juror in his case should be rejected because of an abuse of the writ. May 10 R & R at 1511. The magistrate did not have the benefit of the Supreme Court's recent decision in *Delo v. Stokes*, —— U.S. ——, 110 S.Ct. 1880, 109 L.Ed.2d 325 (1990). However, *Delo* supports the magistrate's conclusion that where, as in this case, the issue was apparent from the record before the filing of prior petitions for habeas corpus and was not raised, a new petition thereafter filed which attempts to raise the issue is barred by the abuse of the writ doctrine. The magistrate's recommendation concerning abuse of the writ on the juror excusal issue is consistent with *Delo v. Stokes* and is accordingly adopted as the conclusion of this court.[4]

The magistrate, in both the August 17 and May 10 reports, recommended that Mr. Andrews' claims which requests retroactive application of new constitutional doctrine should not be allowed because of the Supreme Court's decisions in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Saffle v. Parks*, —— U.S.·——, 110

S.Ct. 1257, 108 L.Ed.2d 415 (1990); and *Butler v. McKeller*, —— U.S. ——, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). The court agrees with the magistrate's conclusion.

Subsequent to the magistrate's May 10 R & R, the Supreme Court made another decision which bears on this issue. In *Sawyer v. Smith*, —— U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), the Court held that *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), had no retroactive application under the *Teague* ruling. The decision effectively overrules the retroactivity holding of *Hopkinson v. Shillinger*, 888 F.2d 1286 (10th Cir.1989).[5] Therefore, *Hopkinson* is no longer governing law in this Circuit on retroactivity in habeas corpus proceedings.

The *Sawyer* Court acknowledges that *Teague* allows retroactivity in applying a new rule in a habeas corpus claim if the claim comes "within 'one of two narrow exceptions.' " *Sawyer*, —— U.S. at ——, 110 S.Ct. at 2831 (quoting *Saffle*, 110 S.Ct. at 1259). The Court noted "a rule that qualifies under this exception must not only improve accuracy, but also 'alters our understanding of the *bedrock procedural elements*' essential to the fairness of a proceeding." *Id.* (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. at ——) (emphasis in original). Any application of a new rule must be "an 'absolute prerequisite to fundamental fairness.' " *Id.* —— U.S. at ——, 110 S.Ct. at 2832 (quoting *Teague*, 489 U.S. at 314, 109 S.Ct. at ——). Further, the Court reiterated that it was " 'unlikely that many such components of basic due process have yet to emerge.' " *Id.* at ——, 110 S.Ct. at 2832 (quoting *Teague*, 489 U.S. at 313, 109 S.Ct. at ——). The rationale for this application of *Teague* is explained by the *Sawyer* Court as follows:

The principle announced in *Teague* serves to ensure that gradual develop-

---

4. Petitioner points out an exception to the general rule in *Swain* that when the prosecutor offers his reasons for use of the peremptory challenge those reasons may be subject to review by the court. However, that exception is limited to circumstances in which the prosecutor makes those reasons a part of the trial record. *Weathersby v. Morris*, 708 F.2d 1493, 1496 (9th Cir.1983). The facts alleged in this case relevant to the peremptory challenge of the only black juror were never a part of the trial record and therefore do not fit within the *Swain* exception.

5. Although the Supreme Court affirmed *Hopkinson*, it was as to its result and not the application of *Caldwell*.

ments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered. This is but a recognition that the purpose of federal habeas corpus is to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrines.

*Sawyer,* —— U.S. at ——, 110 S.Ct. at 2829.

This court holds that *Sawyer* supports the magistrate's conclusions in this case, especially with reference to petitioner's extended argument on the application of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). The petitioner's contention goes well beyond *Beck.* It requires rejection of state procedural rules on instructions and requests a whole new rule of constitutional criminal procedure. Acceptance of such a result is hardly dictated by procedural needs of fairness. The traditional state and federal rules on lesser included offenses are adequate to address the fairness issue. Therefore, *Teague, Sawyer,* and other cases require rejection of petitioner's lesser included offense claims.

For the reasons set forth herein, the court adopts the magistrate's R & R and denies petitioner's supplemental writ of habeas corpus. IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

RONALD N. BOYCE, United States Magistrate.

The petitioner, William Andrews, an inmate confined at the Utah State Prison (U.S.P.) filed a petition for writ of habeas corpus in this court seeking relief under 28 U.S.C. § 2254. The original petition filed with this court was denied by the District Court on August 18, 1989. (File Entry # 36). However, on August 17, 1989 the petitioner filed a supplement to the original petition for habeas corpus. (File Entry # 35). The petition alleged that at the petitioner's original trial in Second District Court, State of Utah, where petitioner was convicted of capital murder and sentenced to death, the prosecution deliberately excluded the only black juror on the prospective jury panel and thereby violated the petitioner's constitutional rights. A second issue was also raised contending that during the sentencing proceedings in petitioner's case the prosecution presented false testimony from a prosecution witness, Dr. Allen Roe, a psychologist then employed by the Utah Department of Corrections who gave testimony that three persons in the State of Utah had committed murder after prior murder convictions. The petitioner contends such information was false in part. The petition alleges that on August 10, 1989 Dr. Kay Gillespie, an expert in crime and corrections in Utah, advised counsel for petitioner that such information appeared to be incorrect.

The petitioner alleged the facts as to the possible improper use of peremptory challenge were stated in petitioner's first post-conviction petition in state court as part of a claim of discrimination, but the exact same claim as that presented in this supplemental petition was not presented until an original petition for habeas corpus presented to the Utah Supreme Court before petitioner's scheduled execution. After denial by the Utah Supreme Court the petitioner's supplemental petition was presented to this court.

The petitioner indicates the false testimony issue was not raised in the original petition for habeas corpus before this court because the issue had not been exhausted before the Utah courts and it is also claimed the underlying facts were not known to counsel.

The supplemental petition was accepted and counsel given an opportunity to present supportive materials. (File Entry # 49). A supplemental allegation in support of the petition for habeas corpus amplifying the petitioner's claims was also filed. (File Entry # 52). As a result a response was ordered to be filed by the respondent. (File Entry # 54). Thereafter, a response to the petition was filed by the respondent. The respondent contended as to the peremptory excusal of the black juror that petitioner had failed to

make a timely objection at the time of trial, that the Utah Supreme Court decided the issue on an independent and adequate state ground, the petitioner's claim was an abuse of the writ, that petitioner had procedurally defaulted on the issue, and that on the merits the excusal of the black juror issue was without legal merit. The respondent also contended the testimony of Dr. Roe was of no constitutional consequence. (File Entry # 57).

Both of the issues in the supplemental petition were first presented to the Utah Supreme Court immediately prior to the petitioner's scheduled execution. The Utah Supreme Court acted with admirable swiftness and on August 18, 1989 denied any stay of petitioner's execution and addressed the issues.[1] *Andrews v. Barnes,* 779 P.2d 228 (Utah 1989). The majority of the Utah Supreme Court concluded that the peremptory challenge of the black juror by the prosecution followed a challenge for cause to the juror by Andrews' counsel and his co-defendant's counsel which the state trial judge denied. The Utah Supreme Court concluded:

> Having twice sought to remove Mr. Gillespie from the jury panel, William Andrews cannot now claim that he was somehow prejudiced by the State's removal of Mr. Gillespie. For these reasons, we do not believe that petitioner's constitutional rights were in any way prejudiced.

As to the second issue raised by the petitioner, that of the false testimony in the sentencing phase, the court said even as-suming petitioner's argument is accurate any error was insufficient "to have played any role whatsoever in the jury's determination of the appropriate penalty under the circumstances." *Id.* p. 229.[2] It was in this posture that the supplemental petition for habeas corpus was before this court. The petition for habeas corpus had been referred to the magistrate under 28 U.S.C. § 636(b)(1)(B). The district court denied a stay of execution and the Court of Appeals for the Tenth Circuit granted a stay of execution thus allowing additional time to examined the supplemental petition.

The petitioner requested an evidentiary hearing on the peremptory challenge issue. (File Entry # 61). The respondent contended no such hearing was necessary. (File Entry # 58). Both responses were filed by the parties in response to an order of the magistrate of August 28, 1989.[3] The magistrate had previously held a hearing to give the parties an opportunity to address the effect of the Utah Supreme Court's decision. Based on the responses the magistrate determined that evidentiary hearing was warranted on the peremptory challenge issue. See Rule 8, *Rules Governing Section 2254 Cases,* 28 U.S.C. § 2254(d); *Townsend v. Sain,* 372 U.S. 293, 319, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963) ("... that the material facts were not adequately developed at the State court hearing ...")[4] (File Entry # 62). Discovery was also allowed on the issue. Eventually a hearing was held on the supplemented petition.

In addition, the magistrate requested affidavits or other information on the issue

---

1. The Utah Supreme Court said petitioner stated "good cause" under Rule 65B(i)(4), U.R.C.P., "which warrants addressing the issue on its merits even though there have been previous petitions on the writs of habeas corpus filed in this court." 779 P.2d 228. Citing *Hurst v. Cook,* 777 P.2d 1029 (Utah 1989). On its merits must be read as distinguished from dismissal for abuse of the writ of habeas corpus. See *Andrews v. Shulsen,* 773 P.2d 832 (Utah 1989). That does not mean the substantive merits of the claims were resolved as distinct from any procedural deficiencies that may effect the claims. This separate issue must be independently examined.

2. Justices Durham and Zimmerman dissented from the denial of a stay of execution and

indicated a desire for an evidentiary hearing on the peremptory challenge issue. They did not indicate whether this was based on state or federal legal concerns. They did not dissent as to the false testimony issue.

3. The magistrate's order was prompted in part by the dissenting opinions of Utah Supreme Court Justices Durham and Zimmerman.

4. The facts had not been developed in the Utah state courts in any judicial hearing. There was an examination of the state prosecutor on the peremptory challenge issue, which occurred at a hearing of the Utah Board of Pardons, and the issues were presented directly to the Utah Supreme Court.

of why the two issues were not presented earlier. In this regard an affidavit from counsel for petitioner's co-defendant, Dale Pierre, was submitted. Mr. Gilbert Athay, counsel, states that at the time of trial he had no information on the subject matter of Dr. Roe's testimony.[5] Athay states he first heard of any inaccuracy in conjunction with Dr. Roe's testimony at the petitioner's, Andrews, clemency hearing before the Utah Board of Pardons.

The petitioner, William Andrews, also submitted an affidavit that "I recall nothing about that testimony." (File Entry # 75). He also states he had no information that the testimony of Dr. Roe was false or misleading in petitioner's Board of Pardons hearing. Andrews states he has asked his lawyers to raise all available issues and not hold back any issues. The petitioner's current counsel, Timothy K. Ford, who has represented the petitioner since November, 1978 also filed an affidavit. (File Entry # 76). In July 1989, Ford met Dr. Kay Gillespie, a professor at Weber State College, Ogden, Utah. Gillespie is an expert on the death penalty in Utah. During the conversation Ford mentioned Roe's testimony and Gillespie expressed surprise. Gillespie agreed to look into the matter. Eventually at the hearing before the Board of Pardons, Gillespie reported his finding, which apparently did not corroborate those of Dr. Roe. Ford states he had no evidence of any falsity as to Dr. Roe's testimony until talking with Gillespie on August 10, 1989. He had assumed Dr. Roe's testimony was reliable.

In support of his petition, Andrews, through counsel Timothy K. Ford, also presented an affidavit as to the challenges for cause and peremptory challenges of the jurors at petitioner's trial. (File Entry # 77).

The respondent was allowed to supplement the record and an affidavit of respondent's co-counsel David S. McConkie was presented which suggested the testimony of Dr. Roe was substantiated by a file at the Utah State Prison that Dr. Roe had kept. (File Entry # 80). Dr. Allen Roe

submitted an affidavit. He states he was subpoenaed to appear at the Andrews' trial in 1974. He did not have his file with him. He knew at least three persons had murdered and murdered again. He has since discovered four persons who have been housed at the Utah State Prison who have murdered and murdered again. Rap sheets of the four persons are attached to Dr. Roe's affidavit.

Attorney John Caine, who represented the petitioner at trial, and afterward, has provided an affidavit stating that at the sentencing hearing in petitioner's case, Caine had no information that Dr. Roe's testimony may have been false and received no information thereafter until he heard of Dr. Gillespie's information in the summer of 1989.

Finally, an affidavit of Kurt A. Fisher, was submitted by respondent (File Entry # 93) based on the files of the Utah Department of Corrections which recites that Utah prison files show four persons that the Utah Attorney General had mentioned had killed and killed again. The affidavit names four individuals as repetitive killers.

A hearing was held before the magistrate on October 6, 1989 on the supplemental petition. The deposition of Victor Gabrenas was presented as evidence. The petitioner William Andrews, trial prosecutor Robert J. Newey, attorney James E. Davis and attorney Robert Neely also testified.

At the hearings before the court on the use of the peremptory challenge by the prosecution to excuse the only black juror, the issue was characterized by the parties as a "Swain" issue under the standard of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). It should be understood therefore, that the parties presented the evidence in this case on the jury issue under the *Swain* standard and not that under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

---

**5.** Dr. Roe gave evidence for the prosecution at the sentencing phase of the trial on the number of murder recidivists at the Utah State Prison during his experience. The petitioner claims the testimony was false.

The record of peremptory challenge strikes made by defense and prosecution was introduced (Exhibit 3). The exhibit reflects that juror James H. Gillespie, Jr., juror number 3, was peremptorily challenged by exercise of the state's tenth peremptorily challenge exercised by Weber County Attorney Robert L. Newey. Mr. Gillespie was the only black juror. He was at the time a police officer and twenty-eight years old.

The petitioner, William Andrews, testified he is a "negro." (Hearing Tr. p. 13). (Hearing Tr. of October 6, 1989).[6] He stated he was present throughout the jury selection process and only one other black was on the jury. The petitioner's trial counsel, John Caine, did not consult with petitioner concerning any exercise of peremptory challenges. (Id. pp. 13–14). However, on cross-examination, it was apparent the petitioner had no recollection of the peremptory exclusion process or the jury selection. (Id. pp. 14–17).

Robert Newey the state's prosecutor at petitioner's trial, testified at the hearing. At that time, Newey was a retired senior judge. (Id. p. 19). He testified that during his time as District Attorney and County Attorney[7] he had no practice of exclusion of minorities from juries because of their status (Tr. 19–20). There was no systematic exclusion of minorities by Newey or his deputies (Id). No policy or procedure exerted to exclude minorities by exercise of peremptory challenge. (Id. p. 20). Newey did exercise a peremptory challenge against juror James H. Gillespie, Jr. in the petitioner's trial. (Id. p. 21). It appeared that the petitioner and co-defendant, Dale Pierre, wished Gillespie removed and made a motion to exclude Gillespie for cause. Newey joined in a stipulation, but another codefendant opposed excusal of Gillespie. The trial court refused excusal.[8] (Hearing Tr. p. 22). The witness' testimony before the Utah Board of Pardons, discloses Newey said the reason for the challenge was:

THE WITNESS: Part of the reason was that he was black, and the defendants were black and he might be susceptible to undue pressure, he may not. I don't know. That was part of the reason, but there were other reasons. He was young. He's since become one of our top law enforcement agents in the state. (Exhibit I). (See also hearing Tr. pp. 24–25).

Newey, at the hearing of this matter before this court, went on to amplify his exercise of the peremptory challenge against Gillespie:

He was—he had been a police officer and at the Board of Pardons hearing I believe I was asked did I recall and I said I don't recall, I think he was, but that is part of the reason. He had been acquainted with and supervised by, worked with at least 26 of the officers that had—when he worked—that investigated the Hi–Fi case when he was—before he went to work for the State of Utah, and before he was called as a prospective juror in the Hi–Fi case.

His father was the—I don't know whether the term is president or head of the NAACP in Ogden and a number of the jurors—prospective witnesses that were to be called in the case were black and I felt from his standpoint that there might be undue pressure on him. I felt he would be a very excellent juror for the State but from his standpoint undue pressure might be placed upon him as the only—well, for the reasons I have stated.

(Hearing Tr. pp. 25–26).

Part of the reason for the challenge was that the juror was black and would possibly feel pressure. (Id. p. 26). There was also evidence that the juror was acquainted with some prosecution witnesses who were also black but the juror, Gillespie, said that would not effect his judgment. (Id. p. 28). The black community in Ogden, Utah where the petitioner's crime occurred, was not supportive of the "defendants". (Id. p.

---

**6.** Hereinafter referred to as (Hearing Tr. p. ——).

**7.** Utah changed from a District Attorney felony prosecution system to a County Attorney System in 1973.

**8.** The hearing transcript on this point is inadequate (See p. 22). Some reasons for exclusion were also stated in Newey's testimony before the Utah Board of Pardons. (Pet. Exhibit # 1).

29). Mr. Newey also testified as to the reason the petitioner and his counsel and co-defendant and counsel had moved for exclusion of Gillespie for cause (Id. pp. 31–32):

Mr. Gillespie, on voir dire, and I believe it was by Gil Athay, had testified that he was acquainted with, had either worked with, been supervised by, had lifetime friendships with, played football or basketball with at least 26 of the total number of investigating officers in the case. He was then asked by Mr. Gil Athay if, when Mr. Gillespie made a case, investigated a case and presented it to the court if he considered that particular defendant, did he presume him to be guilty, and he answered yes, he did. And then Mr. Gillespie was asked, would you—I'm paraphrasing now—make the same presumptions with cases of these officers that you are acquainted with and worked with and he said yes, except for a couple. There was an objection then by Mr. Athay and Mr. Caine that Mr. Gillespie be excused for cause.

And I can go into the sections of the statute. One was that he had worked for the State of Utah and I would not agree that that was a ground of implied bias just because he worked for the State of Utah. And I think I stated that every school teacher or person that worked for a university then would be excused for cause. And Mr. Athay argued under a different section that there appeared to be implied bias because of his feelings being prosecution oriented. I stipulated that Mr. Gillespie could be excused for cause and I articulated it or spoke—stated it for the possibility that there would need to be a retrial, a possible appeal and that I, for these reasons, that in case there was error, there was arguable error, that I would stipulate that he could be excused for cause.

One of the attorneys, and I believe that was Mr. Davis, would not stipulate and Judge Wahlquist then said he would not excuse him for cause. And that was the primary reason, reversible, possible reversible error, arguable error that I exercised the peremptory challenge.

Gillespie was challenged by the prosecutor on the state's tenth peremptory challenge. (Id. p. 36).[9] At the time the defense had exercised nine challenges (Id.) and still had peremptory challenges left. (Id. 37 lines 8–12). Newey felt it was critical to exercise the one challenge he had left at that time. (Id. 37 lines 1 & 2). No other lawyers than assistant Robert Wallace worked with Newey on the case. (Id. 38). Newey was the attorney who made the decision on the exercise of the peremptory challenges. (Id. 38 lines 12–13). It also appears from Newey's voir dire notes, that Officer D.K. White, the principle investigator in the Hi–Fi (Andrews–Pierre) case had been a supervisor of juror Gillespie, who had been an Ogden police officer. Gillespie was at the time of trial a state liquor control officer. (Id. p. 42). Gillespie also apparently knew other officers involved in the case. (Id. 42–44).

Newey, under questioning from petitioner's counsel, made an explanation as to why Newey believed exercise of the peremptory challenge may be necessary to avoid reversible error. (Id. 54 lines 6–25).

Well, this is a composite and it is a subjective think, but in the case of Mr. Gillespie he had already testified on voir dire that he presumed a person that he had made a case against to be guilty, and he presumed the same thing with his fellow officers except for a couple. And that was brought out by Mr. Athay and he had never been asked specifically the question can you put that aside and decide this case and so forth.

And I am now going back to my notes on Mr. Greenwell. There were some other things. He says he knows Robert VanSciver, Utah State, same fraternity. And so there were things that would weigh on both sides that I arrived in each juror's case at a subjective decision on whether they should be excused for cause or whether it be peremptorily but I was primarily concerned, and I stated it to Judge Wahlquist, that I would stipulate that Mr. Gillespie could be excused for cause upon the challenges of Mr. Caine and Mr. Athay and no such a situa-

9. This was the last peremptory challenge the state had to exercise.

tion took place in the case of Mr. Greenwell for reasons I don't know today. I don't know.

(Id. 54 lines 6–25).

Newey testified that in exercising the peremptory challenge against Gillespie, he did not think of the fact that the remaining jurors would be white persons. (Id. p. 56).

Newey had tried numerous cases from 1954 to 1974 and he said in none of those cases did he ever exclude a prospective juror because of race.

In Gillespie's voir dire he denied that he had any pressure on him. (Tr. p. 68).

> "No. Sir. I am a police officer and I have had that experience throughout most of my life and when I came back to Utah I did not feel anything one way or the other after the Hi–Fi case either more so or less from either the black community or the white community."

The voir dire of juror James H. Gillespie is set forth in Pl. Exhibit 4.[10] Gillespie stated he was married and had three children and was a peace officer for the State of Utah with liquor and narcotics enforcement. He was a graduate of the State Police Academy. (Tr. 255). He knew victims of crimes and was knowledgeable about firearms. (Tr. 256). Being a minority would not effect his ability to try the case. (Tr. 257). He had information about the crime. (Tr. 260). Gillespie had testified in cases Newey had prosecuted. (Tr. 263). He knew officers who were going to testify and had worked with them. (Tr. 264–270). Gillespie had started in law enforcement in the Air Force, then joined the Ogden Police Department and then the state liquor and narcotics force. (Tr. 270). He had met Dr. Naisbett, one of the murder victim's husband and also father of one of the survivors who was badly harmed. Gillespie knew other victims' families. (Tr. 275). Gillespie was thoroughly examined by all counsel and stated he believed he could act fairly as a juror. D. Gilbert

Athay, on behalf of Dale Pierre, moved to strike Gillespie for bias. (Tr. 282). Mr. Caine, on behalf of Andrews, also moved the juror's removal. Mr. Newey passed Gillespie for cause as did co-defendant's counsel Mr. Davis. The trial judge left Gillespie on the panel. (Tr. 286).

Newey still believed there would be pressure on Gillespie. (Id. p. 68–70).

James F. Davis, was in the Weber County Attorney's Office between 1972 to 1983. (Id. p. 81). He testified that during his time with the Weber County Attorney's Office, there was never any policy of systematic exclusion of jurors because of race. (Id. 81–82). Newey had made no statements or imposed any policy of such a nature in the Weber County Attorney's Office. (Id. p. 82). The peremptory challenge policy of the office was up to the individual deputy assigned to the case. Davis was not aware of any case in which an attorney exercised a peremptory challenge based on race. (Id.).

Robert Neeley, an attorney in Ogden, Utah was a Deputy Weber County Attorney from 1971 to 1979 or 1980. He was unaware of any policy of the office with respect to the exclusion of jurors based on race. (Id. 84). To Neeley's understanding there was no policy on exercise of peremptory challenges. He was unaware of any instance when Newey exercised a peremptory challenge based on race. (Id. 84–85). Neeley never discussed the challenge of juror Gillespie, in this case, with Newey. (Id. 86).

The respondent also offered evidence [11] that Newey agreed to removal of other potential jurors for cause where the jurors indicated some prosecution orientation (voir dire and testimony of prospective jurors Allred, Greco and Kimball). (Trial Tr. pp. 417, 1014 and 1208). This matter as well as other matters [12] offered by the parties are considered too collateral to be of significance to the issue.

---

**10.** In the record of trial the voir dire begins at p. 254. References will be made to the trial transcript rather than Plaintiff's Exhibit 4.

**11.** Judicial notice was taken of the transcript of the State record which is a part of the record in

this case under 28 U.S.C. § 2254 and Rule 7, *Rules Governing Section 2254 Cases.*

**12.** This includes a reference in Newey's opening statement that defendants had indicated a willingness to kill "white" persons during the robbery when the statement given by investigator

Mr. Robert R. Wallace who had been a Deputy County Attorney assisting Mr. Newey in the Andrews prosecution gave a deposition.[13] Wallace had a minimal participation in the voir dire and selection of the jury in the Andrews case. (Wallace Dep. p. 5).[14] Wallace had no real participation in the jury selection. (W.Dep. p. 6). Wallace was not present during much of the jury voir dire. (W.Dep. p. 7). Wallace obtained the documents from the Weber County Attorney's Office that related to the jury selection in this case. (W.Dep. p. 11). During Andrews' trial, Wallace acted as a second chair lawyer primarily keeping track of exhibits and witnesses. (Tr. 16–17). Wallace had no recollection of assisting Newey in the jury selection at Andrews' trial. It was unclear whether jurors were rated in any numerical fashion by Wallace. (Tr. 18–22). Juror Gillespie may have been the last juror for which Wallace was present during the voir dire. (Tr. 26–27). Wallace took some notes on Gillespie such as number of his children. (Tr. 29). Gillespie and Wallace had a discussion a few weeks before Wallace's deposition in which Gillespie told Wallace he could not believe why Gillespie was not challenged for cause. (Tr. pp. 33–36). Gillespie was a career police officer and now works for the Utah Department of Corrections.

Wallace testified he recalled a conversation with Newey to the effect that Gillespie should be challenged to avoid any problems on appeal.

The depositions of Victor M. Gabrenas [15] was also taken and received in evidence. Attached to the deposition are the notes and relevant papers in the possession of the Weber County Attorney's Office pertaining to the jury selection process in petitioner's case. Gabrenas is the Chief Investigator for the Weber County Attorney's Office in Ogden, Utah. He has held that position since July of 1974. That was after the killings in this case but prior to the trial. (Gab. Dep. p. 6). Gabrenas is also the records custodian for this particular case. He does not hold the position of the records custodian for other purposes. (Id.). The files in the instant case were kept in a single file drawer. (Gab. Dep. p. 9). The records on the jury selection were kept in a file with other matters pertinent to the case. (Id. p. 11). The documents relevant to the jury selection were retrieved. These documents have been discussed in the context of the testimony of Robert L. Newey and Robert R. Wallace. Gabrenas had no participation in the actual jury selection. (Gab. Dep. p. 13). Gabrenas did make a complete search of records for the jury selection materials pertinent to the "Gillespie" exclusion. (Gab. Dep. p. 16). No directives existed as to jury selection. (Gab. Dep. pp. 16–18). Gabrenas was not asked to do a background check on jurors selected or excused in the Andrews case. (Gab. Dep. p. 25). He was merely given a list of the jurors and asked if he knew any of the jurors. (Id.). He did not check the records of the Davis and Weber County Sheriff's Office against the juror list. (Gab. Dep. p. 26). He may have checked generally with Davis County police departments. (Gab. Dep. p. 27). He prepared handwritten notes on the jurors. The notes provided background information. (Gab. Dep. p. 28–30). The notes on Gillespie listed him as a liquor officer with the liquor enforcement agency. (Gab. Dep. p. 32).[16] The above is

---

Platco to Newey did not contain the racial reference to "white" persons. See Petitioner's exhibit 5 & 6.

**13.** Mr. Wallace represents respondents in this case. Normally the advocate/witness rule would preclude Mr. Wallace from representing respondents and testifying in the same case. However, in this case petitioner gave no notice as to the need to call Mr. Wallace until after the supplemental petition was filed. It would work an unfair hardship to preclude Mr. Wallace's representation. Further, petitioner ought to have an opportunity to present Wallace's evidence. Rule 601, F.R.E., does not recognize the advocate witness rule. Rule 3 T(3), Rules of Professional Conduct of the Utah Supreme Court, provides if a hardship would be imposed on a client, the normal advocate/witness rule is not applicable. A jury is not involved in this case.

**14.** Hereinafter cited (W.Dep. p. ——).

**15.** Hereinafter cited (Gab. Dep. p. ——).

**16.** Apparently Gillespie had been an Ogden City police officer and then transferred to liquor enforcement conducted by the State of Utah.

the extent of the evidence presented before the magistrate on the issue of the jury selection in this case.[17]

Based upon the above evidence the magistrate enters the following findings of fact:

1. The trial of William Andrews took place in Weber County, Utah in the fall of 1975. Robert L. Newey was the Weber County Attorney and personally prosecuted the case. Co-defendant to Andrews, Dale Pierre, was represented by D. Gilbert Athay, Esq., and Andrews was represented by John Caine, Esq. A co-defendant Keith Leon Roberts, who was not convicted of murder, was represented by separate counsel. From a point after conviction and initial appeal and during other appeals and various post conviction proceedings the petitioner, William Andrews, was also represented by Timothy K. Ford. Ford entered the case in November 1978.

2. At the time of trial the general jury array was called and individual jurors called for voir dire examination as to their qualifications. There is no claim or showing of any systematic exclusion of jurors in this process or any other improper, racially motivated selection of jurors for examination as to their fitness to serve on the trial jury.

3. The jurors selected for examination to determine their qualifications for the final panel included only one black (Afro–American),[18] James H. Gillespie, Jr. Mr. Gillespie was a Weber County resident and a police officer. He was at the time of trial employed with the liquor enforcement agency of the State of Utah. He was, after trial, employed by the Utah State Liquor Enforcement Agency and is currently employed by the Utah Department of Corrections.

4. After the voir dire examination both Mr. Caine and Mr. Athay on behalf of their clients (petitioner Andrews was represented by Mr. Caine) moved at least twice to challenge juror Gillespie for cause. The

trial judge did not allow the challenge. Mr. Davis, counsel for co-defendant Roberts, refused to join the challenge for cause. The prosecutor, Robert L. Newey, indicated a willingness to stipulate to the exclusion of juror Gillespie but this did not effect the trial court's ruling. The juror, Mr. Gillespie, was acquainted with some prosecution witnesses and some police officers involved in the case. Gillespie stated that such factors would not influence his judgment. It was prosecutor Newey's judgment that the black community in Weber County was not sympathetic or supportive of the defendants. This was Gillespie's assessment which he made during the voir dire. Prosecutor Newey exercised his last, tenth peremptory challenge, to exclude Mr. Gillespie from the trial jury panel. The defense at the time still had peremptory challenges left.

5. Newey peremptorily excused Gillespie for a variety of reasons. The fact that Gillespie was black was a factor in the challenge. Newey believed that Gillespie, as the only black juror, may be subject to pressure in the community. Newey also was concerned that a peremptory challenge might avoid an issue on appeal as to the refusal of the defense challenge for cause. Further, Gillespie was a state liquor enforcement agent, had been an Ogden city police officer, and knew witnesses. The record also shows that D.J. White, the investigator on the murder case against petitioner, may have been a supervisor of Gillespie at one time. Gillespie knew and worked with other police officer witnesses. Also, Newey thought Gillespie was young and might be less able to withstand pressure. Although Gillespie was twenty-eight years old it is reasonable to consider that he was youthful in the context of the relative ages of jurors and Gillespie's life experience.

6. Newey had no standing policy in his office on how jurors should be selected, the determination was left to a case by case

---

**17.** Evidence as to the testimony of Dr. Roe is considered hereinafter.

**18.** The term "black" will be used in the report and recommendation since the case law relates

more to race than ethnic derivation. A person may be a racial black without African ancestry or Afro–American without being black.

basis. There was no policy either in the Weber County Attorney's Office or with prosecutor Newey to exclude blacks from jury service for any reason other than the qualifications of the juror in the particular case. There is no evidence of any practice of exclusion of black jurors in other cases prosecuted by the Weber County Attorney's Office or Robert L. Newey. No evidence has been presented that any other juror, than Gillespie, including black jurors, had been excluded in any other case because of race. There is no evidence of any systematic exclusion of black jurors by Newey, the Weber County Attorney's Office or otherwise in the operation of the courts in Weber County. The exclusion of juror Gillespie based on his race was not because of any belief that a black person would not be fair or could not properly serve, but was because of a belief that Gillespie might be the focus of pressure and because of the actions of defense counsel seeking to exclude Gillespie for cause. There is no evidence to justify a conclusion as to a desire on the part of Newey to have an all white jury.

7. The petitioner, William Andrews, made no objection to the exclusion of Gillespie and the issue as it is now presented was never presented as an issue for appeal in Andrews' first appeal to the Utah Supreme Court, or on the petitions and appeal on habeas corpus in the Utah courts, or on his first petition for habeas corpus and appeal in the federal courts, and in the second petition for habeas corpus and appeal in the Utah courts (773 P.2d 832 (Utah 1989)), or in the initial petition for habeas corpus in this specific case. The issue was first raised in an original petition for habeas corpus in the Utah Supreme Court while the death warrant in this case was outstanding.

8. The petitioner nor counsel for petitioner have produced any evidence or justification as to why the issue of the prosecutor's exercise of the peremptory challenge against prospective juror Gillespie was not raised earlier except to say there had been no exhaustion of state remedies.

9. The issue of the prosecution's exercise of its tenth peremptory challenge against the only prospective black juror, James H. Gillespie, Jr., was apparent from the time of the trial in this case in 1975.

*Discussion*

The respondent contends that the petition must fail because of procedural default and also contends there exists an independent and adequate state ground to deny petitioner relief and that the petitioner has abused the writ of habeas corpus.

*Procedural Default*

It appears to be the essence of the respondent's position that the petitioner did not object to the exclusion of juror Gillespie in a timely fashion and that petitioner knew of the possible issue and never raised it before the Utah courts.

It is believed that the position of the respondent is in error. The petitioner raised the peremptory challenge issue before the Utah Supreme Court in the original petition for habeas corpus relief in that court in 1989. Utah law applicable at the time did allow for such a procedure. Rule 20(b), Rules of the Utah Supreme Court. The Utah Supreme Court could consider the matter or refer it for disposition to a district court. (Id.). In petitioner's case the Utah Supreme Court considered the matter as an original petition. Therefore, there was no irregularity in the Utah process.[19]

The Utah Supreme Court could have avoided the issue on the very grounds urged by the respondent, that being that there was a procedural default in not raising the issue in a more timely fashion. See *Hurst v. Cook,* 777 P.2d 1029 (Utah 1989). However, as noted in *Hurst v. Cook,* supra p. 1035, an issue will be considered by the Utah Supreme Court in spite of procedural default if there is an "unusual circumstance." (citing cases). See most recently *Dunn v. Cook,* 791 P.2d 873 (Utah 1990). The Utah Supreme Court treated the instant case as an "unusual circumstance" case. The Utah Supreme Court, on this

---

**19.** Contrast *Castille v. Peoples,* 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989). See also p.

29 of the magistrate's report and recommendation of August 17, 1989.

issue, expressly said in *Andrews v. Barnes,* 779 P.2d 228 (Utah 1989) *cert. denied* —— U.S. ——, 110 S.Ct. 354, 107 L.Ed.2d 341 (1989):

> ... there is good cause under Rule 65B(i)(4), Utah Rules of Civil Procedure, which warrants addressing the issue on its merits even though there have been previous petitions for writs of habeas corpus filed in this court.[20]

From this position it is apparent the Utah Supreme Court did not rely on a procedural default to deny Andrews' petition for relief.

In *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) it was expressly said:

> Conversely, a federal claimant's procedural default precludes federal habeas review, like direct review, only if the last state court rendering a judgment in the case rests its judgment on the procedural default.

In order for a procedural default to be found there must be a "plain statement" that the state court relied on a procedural default for the basis of denial of relief when the case was in state court:

> Faced with a common problem, we adopt a common solution: a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar.

See also *Neito v. Sullivan,* 879 F.2d 743 (10th Cir.1989). Consider also *Velasquez v. Leonardo,* 898 F.2d 7 (2d Cir.1990). The Utah Supreme Court made a plain statement in this case that there was no procedural bar to the petitioner's claim.

*Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) relied on by respondent has no application in this context. There the court said a *Batson* issue (the *Swain* issue in this case), including inquiry into the prosecutor's motivation, was barred because it was not presented to

the state appellate court. *Id.* 109 S.Ct. at 1067. In this case, the Utah Supreme Court had the *Swain* issue presented to it in the respondent's brief.[21] The Utah court saw fit to address the issue on the basis of a waiver concept. The Utah court apparently considered this issue within its "unusual circumstances" exception to procedural bar. (See Blackmun, J., concurring in *Teague v. Lane,* supra, 109 S.Ct. at p. 1083). Under these circumstances any procedural default claim must be rejected.

*Independent and Adequate State Ground*

The respondents have urged this court to accept the ruling of the Utah Supreme Court that Andrews, by joining with his co-defendant on two occasions to challenge juror Gillespie, lost any right to claim that the State's subsequent use of a peremptory challenge against juror Gillespie denied the petitioner equal protection of the law. (See Point II, File Entry # 57, Response to Additional Petition). In *Andrews v. Barnes,* supra, the Utah Supreme Court stated its holding:

> Based on this portion of the transcript, it appears that the State's reason for being willing to stipulate to the removal of Mr. Gillespie and later for the exercise of a peremptory challenge to strike him from the venire was to protect against possible error and a subsequent appeal that might be based on that issue. In all events, the record is undisputed that counsel for William Andrews clearly agreed to the removal of Mr. Gillespie after the motion to strike for cause was denied. Having twice sought to remove Mr. Gillespie from the jury panel, William Andrews cannot now claim that he was somehow prejudiced by the State's removal of Mr. Gillespie. For these reasons, we do not believe that petitioner's constitutional rights were in any way prejudiced.

779 P.2d at p. 229.

The Utah court seems to have rested its determination on either a theory of waiver

---

**20.** The Utah law does not seem to clearly distinguish between a concept of procedural default and abuse of the writ. Rather each concept seems to be subject to "unusual circumstance"

doctrine discussed in *Hurst v. Cook,* supra. See *Dunn v. Cook,* supra.

**21.** See respondent's brief in the Utah Supreme Court p. 7.

or on the lack of prejudice. The magistrate is of the position that neither concept is an adequate state ground and that to the extent the Utah Supreme Court based its ruling on waiver or lack of prejudice, it has misinterpreted federal law.

The doctrine of independent and adequate state grounds is simply another way federal courts meet the requirement of a case or controversy under Article III, United States Constitution, before rendering an opinion on a constitutional issue. *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803). See also *Osborn v. Shillinger,* 861 F.2d 612 (10th Cir.1988); *Hux v. Murphy,* 733 F.2d 737 (10th Cir.1984). Federal courts do not render advisory opinions, *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911), and if there exists an independent state ground there is no need to address the federal question. *Herb v. Pitcairn,* 324 U.S. 117, 125–126, 65 S.Ct. 459, 462–63, 89 L.Ed. 789 (1945); *Murdock v. Memphis,* 20 Wall. 590, 22 L.Ed. 429 (1875). See also Wright, *Law of Federal Courts,* 4th Ed. pp. 745–754 (1983). The doctrine has application to Supreme Court appellate review of state judgments as well as petitions for habeas corpus. *Wainwright v. Sykes,* 433 U.S. 72, 78–79, 88, 97 S.Ct. 2497, 2502, 2507, 53 L.Ed.2d 594 (1977); *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); Liebman, *Federal Habeas Corpus Practice and Procedure,* § 24.2 (1988). In applying such a rule, certain limitations are applicable. First, the state law grounds must be both independent and adequate. *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); Hill, *The Inadequate State Ground: Proposals For A Revised Doctrine,* 1965 Sup.Court Rev. 187. Further, if the ground is not truly independent, but so interwoven with federal law as to be an unclear standard, then the independent and adequate state ground rule has no application. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Michigan v. Long,* 463 U.S. 1032, 1040–1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983). It will not be assumed that a state court ruling excludes a federal ground unless it is clearly stated. *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct.

3469, 77 L.Ed.2d 1201 (1983). An independent and adequate state ground may be a procedural rule, *Wainwright v. Sykes,* supra; *International Longshoreman Assn. v. Davis,* 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986), or a clear statement and determination of state substantive law. *Fox Film Corp. v. Muller,* 296 U.S. 207, 210, 56 S.Ct. 183, 184, 80 L.Ed. 158 (1935).

The respondent's contention on this issue does not go beyond the procedural context. However, as noted before, the doctrine of *Wainwright v. Sykes,* supra, has no application to this issue because the Utah Supreme Court invoked no procedural rule but addressed the issue "on the merits." Further, the Utah court did not clearly articulate any independent state grounds for its ruling. *Michigan v. Long,* supra; *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *ASARCO Inc. v. Kadish,* — U.S. —, 109 S.Ct. 2037, 2049, 104 L.Ed.2d 696 (1989). Consequently, it must be concluded that the Utah court addressed the issue on the basis of the federal question. An independent and adequate state ground is not present in this case.

Further, it cannot be fairly contended that any kind of waiver doctrine was found or applied by the Utah court in this case. The concept is not mentioned and does not find analysis in the Utah court's opinion. *Harris v. Reed,* supra. Nor is waiver compatible with federal law based on the record in this case. *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). This issue simply has not been reasonably asserted by the Utah Supreme Court and may not be a basis for respondent's position in this court.

Finally, the concept of "prejudice" does not apply to the petitioner's *Swain v. Alabama,* supra, claim. Equal protection claims in the jury selection process may not be defeated by a contention of absence of prejudice. *Id.; Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880); *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); *Castaneda v. Partida,*

430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Sixth Amendment right to jury); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) the court held the systematic exclusion of blacks from a grand jury was not made harmless by a subsequent petite jury conviction. See also *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). In *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) the court refused to apply the harmless error rule to the improper excusal of a juror in a death penalty case, even if the prosecution was hurt by other juror rulings of the trial judge and had to exercise peremptory challenges it would not have otherwise exercised.[22]

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) the Supreme Court held that a standard of prejudice did not apply to claims of denial of equal protection in the selection of a jury. *Id.* p. 219, 85 S.Ct. p. 835 (citing cases). In *United States v. Morris,* 623 F.2d 145 (10th Cir.1980) the Tenth Circuit citing to *Swain* acknowledged the same standard. Although *Swain* has been overruled on the peremptory challenge issue by *Batson v. Kentucky,* supra, *Swain* has not been overruled on the prejudice requirement. No showing of prejudice is required if there has been impropriety in the selection of a juror because of impermissible consideration of racial factors.

Consequently, no legitimate independent or adequate state ground exists on the basis of either waiver or prejudice and neither claim provides, in the context of this case, a legitimate federal basis to deny petitioner's claim.

*Abuse of the Writ*

The respondent contends the petitioner's application for a writ of habeas corpus should be denied based on the fact that the issue, or part of it, was raised in the second amended petition of Andrews filed in federal court June 19, 1984, p. 22. The respondent claims the issue was raised on appeal to the Tenth Circuit and in the petitioner's reply brief. (Para. IV 5 of petitioner's response). The issue of abuse of the writ is a federal issue and the abuse must be shown based on petitioner's prior applications to federal courts. Petitioner's first application for habeas corpus in federal court was in *Andrews v. Shulsen,* 600 F.Supp. 408 (D.C.Utah 1984). In that matter, the petitioner raised claims with regard to the trial jury. *Id.* 415, 417, 418–420. It does not appear that the exact same issue now before the court was addressed in the court's opinion by Judge Winder on Andrews' initial petition. Nothing in respondent's submission shows that the exact same issue now before the court was presented to this court on the first petition for habeas corpus.

The petitioner appealed the previous denial of the writ to the Court of Appeals for the Tenth Circuit. *Andrews v. Shulsen,* 802 F.2d 1256 (10th Cir.1986). The Court of Appeals affirmed Judge Winder's ruling that *Andrews* obtained a fair trial. *Id.* p. 1260. Consequently, petitioner had full opportunity to present the peremptory challenge issue on his first petition to this court.[23] In this case the record of trial court proceedings was available to counsel and clearly expressed the issue. The record contained the voir dire as to juror Gillespie and the exercise of the peremptory challenge by the prosecution. There was full opportunity to pursue the argument. Indeed, there was evidence petitioner's co-defendant, Keith Leon Roberts, opposed the excusal of juror Gillespie for cause. The petitioner has offered no evidence or justification for not raising the issue at an earlier time.

In addition, the petitioner did not raise the issue in the initial second petition be-

---

**22.** The magistrate previously ruled petitioner could not present sociological evidence on prejudice. (File Entry # 63). The ruling was based on the conclusion that if petitioner prevailed on his substantive *Swain* claim, no prejudice was required to be shown for relief to be granted.

**23.** If there was a failure to exhaust state remedies on the issue, this was the petitioner's failure. The law in this area was clearly established and the record that would trigger inquiry was available and the issue obvious.

fore this court. It was only raised for the first time in the supplemental or amended petition before this court on the very eve of petitioner's execution.[24] Under such circumstances it must be concluded the petitioner deliberately withheld the present claim or simply ignored it and has abused the writ within the meaning of 28 U.S.C. § 2244(b) and Rule 9(b), *Rules Governing Section 2254 Cases.* The burden of proof as to the non abuse of the writ is on the petitioner once the claim has been raised by the respondent. *Price v. Johnston,* 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356, 92 L.Ed. 1356 (1948); *United States ex rel. Townsend v. Twomey,* 452 F.2d 350 (7th Cir.1971), cert. denied 409 U.S. 854, 93 S.Ct. 190, 34 L.Ed.2d 98 (1972); *Mitchell v. Kemp,* 827 F.2d 1433 (11th Cir.1987), stay denied 483 U.S. 1050, 108 S.Ct. 14, 97 L.Ed.2d 812.

As the magistrate noted in the prior report and recommendation p. 38:

In *Woodward v. Hutchins,* 464 U.S. 377 [104 S.Ct. 752, 78 L.Ed.2d 541] (1984) the Supreme Court vacated a stay of execution. Justice Powell, writing for himself and the Chief Justice and Justices Blackmun, O'Connor and Rehnquist said the circumstances of the case involved successive petitions or habeas corpus. Justice Powell concluded the case presented an example of an abuse of the writ under § 2244(b). 'All three of Hutchin's claims could and should have been raised in the first petition for habeas corpus.' In this instance the issue of jury prejudice was raised and decided. Justice Powell went on to observe:

A pattern seems to be developing in capital cases of multiple review in which claims that could have been presented years ago are brought forward—often in a piecemeal fashion—only after the execution date is set or becomes imminent. Federal courts should not continue to tolerate—even in capital cases—this type of abuse of the writ of habeas corpus.

*Id.* 464 U.S. at 380 [104 S.Ct. at 753–54]. This is not to suggest that Justice Powell's strong statement necessarily applies

in full force to this petition. However, as to the prejudice claim regarding the napkin, the petition is a desperate one.

In *Antone v. Dugger,* 465 U.S. 200 [104 S.Ct. 962, 79 L.Ed.2d 147] (1984) the court held the petitioner had abused the writ where his claims had been presented to federal courts before. See also *Kuhlmann v. Wilson,* 477 U.S. 436 [106 S.Ct. 2616, 91 L.Ed.2d 364] (1986) where the court said a petitioner must advance or make some showing that the 'ends of justice' are served by successive petitions. No such showing has been made on the juror prejudice issue.

Most recently, the Court of Appeals for the Tenth Circuit addressed the abuse of writ claim in *Coleman v. Saffle,* 869 F.2d 1377 (10th Cir.1989). Coleman was under sentence of death. His death sentence had been based on the Oklahoma 'especially heinous, atrocious or cruel' provision. The case had previously been before the Tenth Circuit. On the second appeal to the Circuit Court, the Court carefully considered the abuse of the writ doctrine:

A federal court may dismiss a subsequent or successive petition for a writ of habeas corpus if 'it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.' 28 U.S.C. § 2254 Rule 9(b). This rule is repeated in slightly different words in 28 U.S.C. § 2244(b), unless it 'alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abuse the writ.'

*Coleman* cautions against the broad application of the abuse of the writ doctrine. However, the facts of this case are differ-

---

**24.** Petitioner's execution was stayed by the Court of Appeals.

ent than those in *Coleman* and the facts in this case do not fit within the ends of justice exception to the abuse of the writ doctrine. See *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). Here, the legal issue raised does not go to the merits of guilt or the fairness of the proceedings. E.g. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Saffle v. Parks*, —— U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). The issue was not raised in the first or second petitions but only as an amendment to the second petition as an eleventh hour assertion. See *Gullett v. Armontrout*, 894 F.2d 308 (8th Cir.1990). The basis on which petitioner now relies for the assertion of his claim for relief was "plainly apparent on the face of the record" at the time of trial. *Prejean v. Smith*, 889 F.2d 1391 (5th Cir.1989). Petitioner could have developed his claim on the peremptory challenge issue prior to his first habeas petition in the Utah courts in full time for presentation in petitioner's first habeas action. There has been no change in the law or new circumstances justifying the delay. See *DeLuna v. Lynaugh*, 890 F.2d 720 (5th Cir.1989); *Hamilton v. McCotter*, 772 F.2d 171, 176 (5th Cir.1985). The issue should have been raised prior to this petition and consequently the failure constitutes an abuse of the writ. *Sanders v. United States*, 373 U.S. 1, 15–19, 83 S.Ct. 1068, 1077–79, 10 L.Ed.2d 148 (1963). To read *Coleman v. Saffle*, supra, as not supporting the abuse of the writ finding in this case, is to read *Coleman* as allowing the writ at any time something slightly different is claimed, regardless of the circumstance. *Coleman* cannot be read so restrictively without destroying Rule 9(b), *Rules Governing Section 2254 Cases* on the abuse of the writ.[25] The writ of habeas corpus on the issue of exclusion of juror Gillespie should be denied for abuse of the writ.

**25.** As former Chief Justice Burger noted in *Gray v. Lucas*, 463 U.S. 1237, 1240, 104 S.Ct. 211, 213, 77 L.Ed.2d 1453 (1983):

This case illustrates a recent pattern of calculated efforts to frustrate valid judgments

### The Peremptory Challenge of Juror James Gillespie

### The Swain Issue

The petitioner contends the removal of the only potential black juror, James Gillespie, to the petitioner's trial jury panel, James Gillespie, by the prosecution's exercise of a peremptory challenge violated the petitioner's constitutional right to equal protection of the law. *Fourteenth Amendment, United States Constitution.* The petitioner places reliance on *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), but in his memoranda to this court, he seems, at some places, to incorporate arguments more appropriate for consideration under the standard of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) which is not the standard applicable to this case.

It is important to keep in mind what this case is not about. In *Batson v. Kentucky*, supra, the Supreme Court held a prosecutor's racially motivated exclusion of a black juror by use of a peremptory challenge could deny equal protection of the law. 476 U.S. at 96, 106 S.Ct. at 1722. *Batson* has no application to this case since the *Batson* standard is not retroactive. *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).

In *Allen*, in a per curiam, decision the Supreme Court affirmed the decision of the Court of Appeals that *Batson v. Kentucky*, supra, did not apply on collateral review to convictions that had become final before the *Batson* opinion was announced. That standard applies in this case. The court addressed the holding in *Swain v. Alabama*, supra, and said

In *Swain v. Alabama*, the Court held that although the use of peremptory challenges to strike black jurors on account of race violated the Equal Protection Clause, a defendant could not establish such a violation solely on proof of the prosecutor's action at his own trial.

after painstaking judicial review over a number of years; at some point there must be finality. I join the Court's action denying the petition for certiorari and denying a stay of execution.

380 U.S., at 220–226 [85 S.Ct. at 835–39]. *Batson* overruled that portion of *Swain*, changing the standard for proving unconstitutional abuse of peremptory challenges.

478 U.S. at 258–59, 106 S.Ct. at 2880.

The court also said it could not say that the *Batson* rule had "a fundamental impact on the integrity of fact finding ..." *Id.* 478 U.S. p. 259, 106 S.Ct. p. 2881. The court said *Batson* "not only overruled the evidentiary standard of *Swain*, it also announced a new standard that significantly changes the burden of proof imposed on both defendant and prosecutor." *Id.* 478 U.S. p. 260, 106 S.Ct. p. 2881. As to the reliance by prosecutor's and courts on the previously articulated *Swain* standard, the court in *Allen v. Hardy*, supra, observed, "[t]here is no question that prosecutors, trial judges, and appellate courts throughout our state and federal systems justifiably have relied on the standard of *Swain*." *Id.* 478 U.S. p. 260, 106 S.Ct. p. 2881. The court also noted that to apply *Batson* retroactively would require hearings years after the conviction became final to determine whether a prima facie case of discrimination had been shown. 478 U.S. at 260, 106 S.Ct. at 2881. This is the very posture of this case and the basis of petitioner's claim. The magistrate in this case allowed petitioner the widest latitude in pursuing the evidence to establish a violation of the *Swain* standard. In doing so, timely objections were raised by respondents to the inquiry of the prosecutor's motive and were overruled. This did not mean the magistrate was applying the *Batson* standard of inquiry, only that the necessary proof for a *Swain* violation, in a death penalty case, should not be narrowly or hastily circumscribed. To some extent the *Batson/Swain* differentiation could not be conveniently maintained as to the admissibility of evidence. Petitioner was allowed ample room to show systematic exclusion of black jurors as a practice in Weber County. However, the burden of proof standard and substantive application of the law cannot be influenced by the liberalization of the admission of evidence in this case.

Subsequent to *Allen v. Hardy*, supra, the Supreme Court again addressed the *Batson* issue in cases which were awaiting collateral review. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). In *Teague* the court announced a new standard for applying new constitutional principles to cases pending collateral review.[26] The court held new constitutional rules of procedure were not to be retroactively applied unless the process was beyond the criminal law making authority, 109 S.Ct. at 1073, or involved a procedure "implicit in the concept of ordered liberty." *Id.* The later standard incorporated the consideration of the accuracy of the fact finding process. The court said the *Batson* standard did not involve a question of accuracy of the trial findings. 109 S.Ct. at 1076, 1077. The absence of a minority juror does not "undermine the fundamental fairness" of a trial or "seriously diminish the likelihood of obtaining an accurate conviction." *Id.* p. 1077. Therefore, the issue in this case does not involve a " 'bedrock procedural element.' " *Id.* It does not involve the fundamental fairness or accuracy of the trial process. Rather it involves a matter of constitutional principal and symbol having a purpose different than the assured accuracy of the verdict in this case.

It is necessary therefore to determine whether the standard of *Swain v. Alabama*, supra, was violated in this case. In *Swain*, the defendant, a black, was sentenced to death on conviction for rape.[27] The defendant raised several attacks on the jury selection process. Among the defendant's claims was that of improper use of peremptory challenges to exclude blacks from serving on petit juries. 380 U.S. at 209, 85 S.Ct. at 829. In Alabama no set

---

**26.** The position stated in *Teague* has now been solidified and reaffirmed in *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) and in the most recent term of court in *Saffle v. Parks*, —— U.S. ——, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) and *Butler v. McKeller*, ——

U.S. ——, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990).

**27.** Now constitutionally precluded by *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

number of peremptory challenges are allowed but a "struck jury" system was used whereby defense and prosecution strike from the jury. The court noted the long history of the use of peremptory challenges and purpose of their use which has not previously required any justification for their exercise. In rejecting the defendant's claim in *Swain* the court stated:

> In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case.

380 U.S. at 222, 85 S.Ct. at 837.

The defendant then went on to claim that since no black had ever sat on a jury in the jurisdiction, that there was consistent and systematic exclusion through the strike process. The court said this issue was different than the prior issue and required a different answer. The court said:

> We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged. But when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Ne-

groes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance.

> If a single black has not been left "on *any* jury" in a criminal case the presumption is overcome. *Id.* p. 224, 85 S.Ct. p. 838. The court then went on to note:

> We need pursue this matter no further, however, for even if a State's systematic striking of Negroes in the selection of petit juries raises a prima facie case under the Fourteenth Amendment, we think it is readily apparent that the record in this case is not sufficient to demonstrate that the rule has been violated by the peremptory system as it operates in Talladega County.

The court felt the record was silent except for the fact the prosecutor struck Negroes in the specific case. The court also noted the prosecutor's wrong is in striking jurors "regardless of trial related considerations." The *Swain* standard will not support a violation by merely showing a striking of a juror in a single case for some racially related motive. The prosecutor's conduct must evidence a policy of systematic exclusion. It was this standard the court overruled in *Batson*, but it is this standard the petitioner must substantiate to prevail. In *Swain* the court would not allow the prosecutor's reasons to be subjected to scrutiny. In this case such inquiry was indirectly allowed by the magistrate to determine if, thereby, petitioner could show a systematic discriminatory application of peremptory challenges. As seen from the findings, no such evidence was presented.

The above interpretation is in keeping with the analysis of *Swain* by experts in the field of criminal procedure. LaFave and Israel, *Criminal Procedure*, § 21.3 pp. 738–739 (1984);[28] *Comment* 52 Va.L.Rev. 1157 (1966); *Note*, 75 Yale L.J. 322 (1965); *Note*, 86 Yale L.J. 1715 (1977); *Note*, 92 Har.L.Rev. 1770. In Wright, *Federal Practice and Procedure, Criminal*, § 384 (1982) it is said:

---

**28.** The discussion is pre-*Batson* and thus not    influenced by *Batson* analysis.

Thus it is not error for a prosecutor to use his peremptory challenges to excuse all blacks from the jury, although a showing that this was done systematically in every criminal case in a particular court might be enough to show that the challenges were being used in an unconstitutional manner.

The holdings of federal courts in interpreting *Swain* have been parallel to the stated analysis. *United States v. Boyd*, 610 F.2d 521 (8th Cir.1979); *United States v. Carter*, 528 F.2d 844 (8th Cir.1975); *United States v. Durham*, 587 F.2d 799 (5th Cir.1979); *United States v. Carlton*, 456 F.2d 207 (5th Cir.1972). Systematic exclusion; 16th Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals, 1985–1986, 75 Geo. L.Rev. 1069 (1987); *United States v. Capers*, 685 F.2d 249, 150 n. 2 (8th Cir.1982); *United States v. Boykin*, 679 F.2d 1240, 1245 (8th Cir.1982); *United States v. Brooks*, 670 F.2d 148, 151 (11th Cir.1982); *United States v. Lewis*, 651 F.2d 1163, 1164 (6th Cir.1981); *Willis v. Kemp*, 838 F.2d 1510, 1518–19 (11th Cir.1988). The petitioner puts reliance on *Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir.1988); *Garrett v. Morris*, 815 F.2d 509 (8th Cir.1987); *United States v. Wilson*, 853 F.2d 606 (8th Cir.1988). However, in these cases the prosecutor volunteered at trial his reasons for exercise of a peremptory challenge.[29] See discussion *Garrett v. Morris*, supra. However, in this case Mr. Newey did not volunteer his reasons at anytime. Both in his testimony before this court and his testimony before the Utah Board of Pardons his reasons for acting were compelled by court ordered questions and objections. Also, there was no statement of reasons given at trial. Contrast *Nevius v. Sum-*

*ner*, supra. This situation is more akin to *Nevius v. Sumner*, supra; *Garrett v. Morris*, 815 F.2d at 510 where the court found the claims insufficient for relief.[30] In this case also, there simply is no showing of systematic excusal which remains the substantive standard petitioner must sustain. Also, no reasons for exclusion were volunteered at any time. In *United States v. Wilson*, supra, the court decided the case under the *Batson* standard and said as to *Wilson*, 853 F.2d at 609:

> It is evident the *Swain* requirement that the defendant must prove systematic discrimination evolved from the presumption that the Government used its peremptory challenges to obtain a fair and impartial jury in that defendant's case. See *Swain*, 380 U.S. at 222, 85 S.Ct. at 837. It is also evident that under *Batson*, there is no need to prove systematic discrimination.

After *Swain* that decision was subjected to intense criticism, especially in academic quarters which one could anticipate.[31] Comment, *Swain v. Alabama: A Constitutional Blueprint for the perpetuation of the All–White Jury.* 52 Va.L.Rev. 1157 (1966); *McCray v. Abrams*, 750 F.2d 1113, 1120–1121 (2d Cir.1984). This led some circuits to move away from the *Swain* rule contending it was wrongly decided or not good law, *McCray v. Abrams*, supra:

> In light of (a) the criticisms of *Swain*, (b) the developments in Sixth Amendment doctrine since the decision of *Swain*, (c) the state court developments curtailing the use of peremptory challenges on a discriminatory basis, and (d) the intimations in the opinions joined by five Justices in connection with the denial of McCray's petition for certiorari that the time is drawing near for a reconsideration of *Swain* is no longer good law.

---

**29.** See *Weatherby v. Morris*, 708 F.2d 1493 (9th Cir.1983).

**30.** *Nevius v. Sumner*, supra, also raised a Sixth Amendment issue, as did *Booker v. Jabe*, 775 F.2d 762, 767–768 (6th Cir.1985) vacated and adhered to on remand. 801 F.2d 871 (1986). In *Booker* the court rejected a Fourteenth Amendment challenge but upheld a Sixth Amendment challenge. The Sixth Amendment position has now been rejected by the Supreme Court in *Holland v. Illinois*, — U.S. —, 110 S.Ct. 803,

107 L.Ed.2d 905 (1990). Therefore, Sixth Amendment analysis may be excluded from consideration in this case.

**31.** It is the legitimate function of the academic community to subject judicial reasoning to rational and pertinent criticism. The academic community does not always achieve the mark. Much academic writing lacks pragmatic assessment and may be influenced by strident political bias.

The Supreme Court acknowledged as much in *Batson v. Kentucky,* 476 U.S. at 92, 106 S.Ct. at 1720. Such cases are not extensions of *Swain,* but the realities of the judicial process by which new doctrine evolves. They are the preliminary alchemy by which old constitutional theory is made into a new constitutional substance. This is the very holding of *Batson,* that *Swain* had to be overruled. *Id.* Such increments do not have application to broaden the prior rule in post-conviction proceedings. As noted in *Teague v. Lane,* supra, the issue must be decided by the "prevailing law." In *Saffle v. Parks,* —— U.S. ——, 110 S.Ct. 1257, 1260–61, 108 L.Ed.2d 415 (1990) this concern was addressed. Precedent existing at the time of conviction is controlling. *Id.* 110 S.Ct. p. 1260:

> Foremost among these is ensuring that state courts conduct criminal proceedings in accordance with the Constitution as interpreted at the time of the proceedings.
>
> \*     \*     \*     \*     \*     \*
>
> '[T]he threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards. In order to perform this deterrence function, ... the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place.'
>
> \*     \*     \*     \*     \*     \*

The 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions.

Applying this standard to this case it is apparent what petitioner seeks from this court is a "new rule." No fair reading of *Swain* and its progeny would support a finding of systematic discrimination in this case sufficient to afford petitioner relief.[32]

To determine otherwise would violate the legitimate reliance the prosecutor and trial court could put on cases in existence at the time, which the Supreme Court said in *Allen v. Hardy,* supra 478 U.S. at 260, 106 S.Ct. at 2881, was an appropriate consideration.

It is also particularly troubling that neither party has seen fit to canvas decisions from the Tenth Circuit, the only controlling precedent outside of the Supreme Court. In *United States v. Jenkins,* 701 F.2d 850 (10th Cir.1983) the court addressed the meaning of *Swain v. Alabama,* supra. The prosecution had excluded the only black juror on the panel by exercise of a peremptory challenge. The court quoted extensively from *Swain* and then concluded (701 F.2d at 860):

> The Court therefore concluded it is permissible to insulate from inquiry the removal of Blacks from a particular jury on the assumption that the prosecutor is acting on acceptable considerations relating to the case he is trying, the particular defendant involved, and the particular crime charged. Id. [380 U.S.] at 223, 85 S.Ct. at 837. The Court did acknowledge that a constitutional claim of added significance would be presented if it were established that a prosecutor in case after case, whatever the circumstances, whatever the crime, and whoever the defendant or victim might be, was responsible for the removal of Blacks selected as qualified jurors by the jury commission, with the result that no Blacks ever served on petit juries, the purposes of the peremptory challenge being perverted. Id. at 223–24, 85 S.Ct. at 837–838. However, in *Swain* no such showing was made.
>
> Nor is such a showing made here. Defendant Jenkins only challenges the Government's conduct in the trial of this case. Defendant does not show any systematic and intentional conduct on the part of the Government calculated to exclude Blacks from juries. Therefore, in

---

**32.** Nor could the "volunteered" rule as to the prosecutor's motivation be reasonably applied in this case. Those cases, infra. p. 41 applied only to prosecution reasons for challenges which were volunteered at trial not those com-

pelled by the judges efforts to afford petitioner wide opportunity to develop the systematic exclusion of black jurors in post-conviction proceedings.

light of the holding in *Swain,* we must conclude that no valid claim of an unconstitutional use of the peremptory challenge is established here by defendant Jenkins. See also *United States v. Boykin,* 679 F.2d 1240, 1245 (8th Cir.1982); *Braxton v. Estelle,* 641 F.2d 392, 394–95 (5th Cir.1981); *United States v. Greene,* 626 F.2d 75 (8th Cir.1980); cert. denied, 449 U.S. 876, 101 S.Ct. 220, 66 L.Ed.2d 98 (1980); *United States v. Danzey,* 622 F.2d 1065, 1066 (2d Cir.), cert. denied, 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980).

In *United States v. Brown,* 770 F.2d 912 (10th Cir.1985) the court considered the government's use of peremptory challenges to exclude all black jurors. The court said:

This Circuit therefore requires a showing of 'systematic and intentional conduct on the part of the Government calculated to exclude Blacks from juries.' Id. In the present case, there has been no showing that the prosecution was responsible for excluding blacks in 'case after case.' *Swain,* supra, 380 U.S. at 223, 85 S.Ct. at 837. Because the defendant has not met this threshold requirement, we must conclude that he has no valid claim of an unconstitutional use of the preemptory challenge. *Jenkins,* supra, at 860.

In *United States v. Chalan,* 812 F.2d 1302 (10th Cir.1987) the defendant, an American Indian, complained of the prosecution's use of peremptory challenges to exclude Indians from the jury. The court decided the matter under *Batson* after explaining the difference between *Swain* and *Batson.* The court said *Swain* required "a pattern of discrimination by the prosecutor over a number of cases in order to establish a prima facie case of racial discrimination." 812 F.2d at 1313.[33] The court did require a post conviction hearing but only on the *Batson* issue.

Most recently, in *United States v. Brown,* 817 F.2d 674 (10th Cir.1987) (*Brown II* ) the court held a peremptory challenge of two black jurors because the prosecutor believed they would acquit because defendant had a black defense counsel violated *Batson.* However, the court did say:

"In fairness to the trial court, the prosecutor's action was justified under the then current view (citing *Swain* and *Jenkins* )."

Since the case had been remanded by the Supreme Court in light of *Batson,* retroactivity was apparently not in issue. It must, therefore, be concluded that the Tenth Circuit cases require a showing of systematic exclusion of jurors on a multiple case basis in order to make out a *Swain* violation. No such showing has been made in this case.

In addition, the facts of this case show a mixture of reasons for the prosecutor's exercise of the peremptory challenge against juror Gillespie. One reason was the youth of the juror; second, the concern over the juror's police officer status and his relationship to witnesses; third, to avoid a problem on appeal;[34] fourth, the fact that given the prominence of the juror's family, and his Negro status, that the juror may have been subjected to undue pressure while sitting in the case.[35]

**33.** The court noted under *Batson* the striking of a single juror of defendant's race may not always be sufficient to establish a prima facie case. *Id.* 1314.

**34.** Even though Utah law may not have clearly mandated reversal for not excusing Gillespie, a prosecutor may act in many instances to avoid an issue from coming up.

**35.** In this instance the racial factor is not to obtain an all white jury or to excuse the black juror because of a belief that he would be unfair because of race, but to reduce an extraneous factor that might effect the juror's performance. Even though Gillespie said he was able to sit and would not feel concerned, the prosecutor could take into consideration all facts. Even in a *Batson* situation, the circumstances would not necessarily make out a prima facie case.

However, in *State v. Cantu,* 778 P.2d 517 (Utah 1989) the Utah Supreme Court held *Batson* to be violated because the prosecutor struck a minority juror simply because the defense counsel wanted the juror. However, in that case the *only* reason for striking the juror was race. In this case other racially neutral factors were extant. See *United States v. Cartlidge,* 808 F.2d 1064, 1070–71 (5th Cir.1987) (multiple factors). Consider *United States v. Martinez-Nava,* 838 F.2d 411, 413 (10th Cir.1988) (Dictum minorities resided in rural areas which would make travel difficult).

There is no evidence, at all, of systematic exclusion of blacks from Weber County juries. There was no policy of the prosecutor or his office to exclude blacks from juries. The petitioner has shown no evidence of an exclusion policy, or for that matter, no other exercise of a challenge against a black juror. The petitioner's claim that the fact that no black attorneys had been employed in the prosecutor's office is not evidence of anything. The petitioner's proof did not show there were any black attorneys in Weber County [36] or that any black had sought employment. The reality is the petitioner's proof on systematic exclusion is non-existent.

Therefore, petitioner has shown no basis on which to claim a violation of *Swain v. Alabama*.

*The Testimony of Dr. Roe*

The petitioner's supplementary application for habeas alleges that false evidence was presented at the sentencing phase of petitioner's trial. (File Entry # 35). The petitioner alleges that the testimony of Dr. Allen Roe, a psychologist employed by the Utah Department of Corrections, gave testimony on the release and recidivism of convicted murders. The petition alleges that Roe testified that three persons who had been inmates at the Utah State Prison had committed murder following murder convictions in the State of Utah. Johnny Markham, Cleo Perea and Paul St. Clair were inmates names that were mentioned. The petitioner alleges that during the course of counsel's preparation for clemency proceedings before the Utah Board of Pardons, Dr. Kay Gillespie, a professor at Weber State College, Ogden, Utah and former member of the Utah Board of Pardons, said he was unfamiliar with the cases "but offered to inquire." Gillespie thereafter advised counsel he could not confirm Roe's testimony. Thereafter, Gillespie advised counsel that two of the three cases mentioned by Roe were wrong and the third could not be confirmed.

Based on these allegations the magistrate allowed the petitioner full discovery, including the opportunity to depose Dr. Roe, and the opportunity to present all relevant materials on the issue. An "addition to petition for habeas corpus" (File Entry # 32) by petitioner was also filed in which petitioner contended the individuals identified as Markham and St. Clair were convicted of a single homicide and Cleo Perea was convicted twice of second degree murder. The petitioner contended the false testimony was material and that the prosecutor "repeatedly" emphasized Roe's testimony on this point.[37] An affidavit of L. Kay Gillespie was also submitted which stated that Gillespie's examination of the records did not support Roe's conclusions as to inmates John Markham and Paul Bunny St. Clair. Dr. Gillespie's affidavit does not address the accuracy of the numerical total of second murder inmates.

As noted before, supra p. 1500, an affidavit of David McConkie, respondent's co-counsel, was filed claiming Roe's testimony was substantiated by Utah State Prison files. (File Entry # 80). That affidavit, (absent the rap sheets that the affidavit claims were attached, that were not, but were later presented), alleges that in fact four persons were at the Utah State Prison who murdered and then murdered again. This is also supported by the affidavit of Kurt A. Fisher, before referred to herein p. 1500, (File Entry # 93) that the prison records show four persons who murdered and murdered again. George William Jackson, Cleo Perea, Howard Smith Bennett, and Willie Tuck Bishop.

In fact, the affidavit of Fisher shows Jackson killed in 1960 and was convicted of manslaughter and in 1969 was convicted of second degree murder. Perea was convicted of second degree murder in 1949 and second degree murder in 1962. Howard Bennett was convicted of second degree murder in 1967 and again in 1973. Bishop was convicted of first degree murder in 1943 and second degree murder in 1952. (File Entry # 93, Exhibit A). All of these cases were prior to Dr. Roe's testimony at petitioner's trial.

---

**36.** The black population of Utah is around .5 of the State population. Rule 201, F.R.E.

**37.** As will be seen, this characterization is a substantial overstatement.

Dr. Roe's affidavit was submitted in which Roe stated he did not have his file with him at trial and testified from memory. This is also apparent from the transcript of the trial testimony of Dr. Roe.

Based on the materials before it, the Utah Supreme Court, which did not have as complete a record as that now before this court, concluded as to this issue:

> Petitioner also asserts that error was committed in the penalty phase of the trial by virtue of the fact that a witness testified that three persons who had been convicted of first degree murder and subsequently released from the state prison had again committed murder. Petitioner asserts that the testimony was inaccurate in that only one of those persons can be shown to have committed murder. Even if petitioner's allegation is accurate, we do not believe that the error was sufficient to have played any role whatsoever in the jury's determination of the appropriate penalty under the circumstances.

779 P.2d at 229.

The two Utah Supreme Court Justices who had dissented, on the failure to hold a factual hearing on the peremptory challenge issue, voiced no objection on this point. The Utah Supreme Court's ruling was unanimous.

The sentencing record reflects that Dr. Roe was called to testify (Tr. 4163) and identified himself as a Ph.D. clinical psychologist who had been at the U.S.P. for eight years. He first testified that based on his studies at the prison, he concluded that individuals sentenced to straight life in prison for first degree murder at the U.S.P., for eight years prior to his testimony, served thirteen years and one month. (Tr. 4164–65). He was asked as to any studies or his acquaintance with persons who were serving sentences for first degree murder and had been released or while incarcerated had committed another murder. His response was:

> A. I know of some who have been convicted of murder, I don't know whether it's murder first or second who were later released and then committed another murder, yes.

Q. Could you tell me what your information is in connection with this?

A. Nothing personal, just from being in the prison. I haven't done a survey on it as such, so I don't know how many.

Q. You do not know how many?

A. No, but I know personally, I think, I remember three.

Q. Who had been convicted of murder and had been released and committed another murder?

A. Yes, I think, so, three.

Q. And that is at the Utah State Prison?

A. They had done their second time at the Utah State Prison. I'm not sure about—I think on two of them they had done time in other states. The one, I think he had done time both times in the state prison. This is just as I remember it.

Q. Okay. So you are saying that you are personally acquainted with cases of three persons who have been convicted of murder—.

MR. CAINE: (Interposing) I object, —.

Q. —and committed murder again.

MR. CAINE: —this is repetitious.

THE COURT: Objection sustained, repetitious. Go to another matter.

Dr. Roe then addressed escape factors. (Tr. 4166). Dr. Roe's direct examination was three pages. Thereafter, Mr. D. Gilbert Athay, counsel for co-defendant Pierre, undertook cross-examination. He asked:

Q. Mr. Roe, who were the three that you personally are acquainted with?

A. As I remember there was, let's see, there was Johnny Markham, Cleo Perea, and Paul St. Clair, I think are the names.

Q. None of those were homicides committed in the State of Utah, were they?

A. Yes.

Q. They were?

A. Yes, I think so.

Q. Are you sure about that?

A. I'm not sure, let's see, all three of them, I think, were doing time for homicides in Utah on the second offense. The second time they committed murder.

Q. When did you check your records, check those three individuals?

A. I haven't. It's from my memory.

Q. I see. You haven't looked at the records at all. Isn't that true?

A. I probably did at one time, but not recently.

Tr. p. 4167.

Athay then examined Roe about two notorious serial killers in Utah who had escaped and about the escape of another notorious inmate, Jack Abbott.[38] Athay focused on the escape methods and opportunities of U.S.P. inmates as well as activities of a number of inmates convicted of murder. (Tr. 4167–4171). Athay examined Roe about the role and process of the Utah Board of Pardons, rehabilitation programs at the U.S.P., another notorious Utah prisoner, Jesse Garcia, who killed in prison. The low rate of murder recidivism was mentioned. (Tr. 4179). The petitioner's counsel Mr. Caine then cross-examined Dr. Roe. (Tr. 4180).

Q. Mr. Roe, let me see if we can put this one figure you gave us in a little more perspective. You said you know of three people who have been in prison and then went out and were paroled and committed murder again. Is that right?

A. That is as I remember.

Q. Do you recall over what period of time this was?

A. No I Don't.

Q. Do you recall how many people you looked at on your survey, how many people that had been put in the prison on a homicide charge and then released?

A. This wasn't a survey. It was just— he asked me if I remembered any and these are the ones that I remember.

Q. So, isn't it a fact, that there are also a substantial number of people that got out and didn't commit murder?

A. That is what we are saying with recidivism.

Q. Right. Thank you. That's all.

The prosecutor on re-cross did not again treat the issue but directed the examination as to inmate Jesse Garcia. (Tr. 4181–82).

The concept of deterrence and confinement of inmates in maximum security was discussed as well as inmate violence. (Tr. 4182–4190). Athay again examined Roe on the release of inmates and brought out that one inmate (Fred Materary) whose murder conviction resulted in a death sentence, followed by commutation, was released and apparently had no further difficulty. (Tr. 4191).

The testimony of Dr. Roe began at Tr. 4163 and at 4191. Only the above quoted matters referred to the issue now before the court.

*Other Sentencing Evidence*

In addition to Dr. Roe, the prosecutor called Dr. Louis G. Moench a psychiatrist (Tr. 4134) who gave a psychiatric opinion on the co-defendant Dale Pierre. Lt. John Regni, USAF, from Hill Air Force Base, Utah was called by the prosecution. (Tr. 4138). He was in charge of the personnel records of the two defendants and testified about reprimands and disciplinary action against Andrews including non-judicial military punishments and reductions. (See 10 U.S.C. § 815). Information was presented that discharge action was pending against Andrews under Air Force Regulation 39–10 but stopped by the judicial proceedings in Andrews' prosecution. Andrews was referred to as a "marginal performer." Andrews' Air Force file was received in evidence. (Tr. 4162). This testimony was more substantial in length than that of Dr. Roe. Finally, the prosecution introduced the fact that Andrews was on probation for theft in Bexar County, Texas. (Tr. 4194). At that point the prosecution rested. (Tr. 4195).

The defense called Dr. Gerald Smith, a University of Utah professor, who gave testimony as to the rationale for the death penalty and his belief in its inefficacy. (Tr. 4200–4205). He also gave testimony on the number of executions versus the number of persons convicted of murder and how in Smith's research the death penalty does not effect the murder rate. Testimony on the

**38.** Abbott received notoriety years after for his book *In the Belly of the Beast* (1981). His acquaintance and support from author Norman Mailer, and a subsequent killing in New York followed Abbott's parole from the U.S.P.

low recidivism rate of murderers was provided. (Tr. 4210–4212). Smith testified his research showed only three persons in the United States who committed capital sentences were followed by other killings. He described the danger of the release of such persons as practically zero. (Tr. 4211–4212). He stated the death penalty was no deterrent and gave his reasons for his position against the death penalty (Tr. 4213–4200), including a suggestion that the absence of capital punishment may actually save lives. (Tr. 4220).

The defense called Frazier Crocker, a U.S.P. employee and Protestant Chaplain at the prison. (Tr. 4235). Crocker then gave the jury what was essentially a discourse on vengeance, religious history and theological teaching. (Tr. 4235–4247). The testimony was lengthy and attempted to show alternatives to the death penalty. (Tr. 4242). He also presented sociological evidence on prevention, rehabilitation, and the need to keep aggressive criminals alive for study. (Tr. 4245).

The defendant, William Andrews testified. He told of his disadvantaged background, the absence of a father, his job corps experience, and his past life history including his difficulties with the law in Bexar County, Texas as well as his Air Force performance. (Tr. 4253–4265). The defense rested and counsel argued the punishment issue to the jury. (Tr. 4279).

The prosecutor Mr. Newey made only *one* reference in his closing argument to the matter at issue in this case.[39] He argued:

> Dr. Roe also testified that he had personal knowledge of three people in the Utah State Prison, not some place else, that had committed a murder and had been incarcerated and paroled and was back in prison for having committed a second murder. Three persons in the State of Utah alone.

(Tr. 4284).

No other mention of the matter was made. Petitioner's counsel, Mr. Caine, did not mention the testimony of Dr. Roe. Mr.

Athay, counsel for co-defendant, emphasized Dr. Smith's testimony and that of Reverend Crocker. (See Tr. 4285, et seq.). Athay referred to Dr. Roe's testimony as to the violence of assaults at the U.S.P. as illustrating that the death penalty was not a deterrent. (Tr. 4291). Athay did not otherwise mention Dr. Roe's testimony.

Prosecutor Newey referred to Dr. Roe's testimony about murders in another area than that now challenged in this court, that being the length of sentences of murderers and numbers of escapes of murderers from the U.S.P. (Tr. 4283), however, he only made the *one* brief reference to Dr. Roe's testimony on the number of recidivist murderers which was as noted before. (Tr. 4184, lines 22–26).

In addition, the magistrate received the deposition of Billie Casper, a paralegal with the Department of Correction. (Casper Dep. October 26, 1989). She searched for and received the relevant documents pertinent to Dr. Roe's testimony. She did corroborate the evidence that two of the persons mentioned in Dr. Roe's testimony, Markham and St. Clair, had not been persons convicted of murder who on release had killed again. (Casper Dep. p. 11). Casper's deposition is a foundation deposition and not otherwise relevant to issues in this case.

The deposition of Dr. Allan V. Roe, taken on October 26, 1989 was also received by the magistrate. Dr. Roe testified he was employed at the U.S.P. from 1967—1986 and thereafter under private contract for two additional years. Roe was chief psychologist during his later tenure at the U.S.P. He is presently employed at a private psychiatric hospital in Utah. (Roe Dep. pp. 3–5). Roe had kept various research files at the U.S.P., which compiled crimological data. (Roe Dep. pp. 5–7). Prior to his testimony at petitioner's trial, Roe did not have with him the relevant file on "murderers" and had done no research on recidivism. (Roe Dep. pp. 19–24). His file at the time of the deposition listed six

**39.** The prosecution's argument began at Tr. 4279 and ended at 4285. It began again at 4299 and closed at 4307.

individuals who had killed and then killed again.[40] Dr. Roe concluded that at least three persons at the time of petitioner's trial had committed recidivist murders on release from the U.S.P. after a murder sentence. (Roe Dep. pp. 86–90). Dr. Roe was not certain as to two of the individuals he had named at trial (Markham and St. Clair) whose record could not be certified. (Roe Dep. pp. 90–91).

Based on the above evidence, the magistrate enters the following findings of fact:

1. Dr. Allan V. Roe was called as a prosecution witness during the penalty phase of petitioner's trial. Dr. Roe gave evidence on the length of sentences of persons convicted of murder in Utah, the number of persons convicted of murder who had murdered again, the recidivism of murderers, escape circumstances and like factors at the U.S.P., the role of Utah Board of Pardons in releasing prisoners and the determination sentences and the circumstances of some of Utah's most notorious killers.

2. Dr. Roe's testimony was only one witness of three called by the state. The defense called witnesses and the testimony of Professor Gerald Smith was substantial and in opposition to the death penalty. It provided criminological testimony in opposition to the death penalty and Smith also testified only three individuals nationwide convicted of capital murder had killed a second time. The court permitted the prison Protestant Chaplain to give extensive moral and sociological evidence against imposition of the death penalty. Petitioner also testified and gave evidence of his disadvantaged background and troubled life.

3. During Dr. Roe's testimony he stated he thought or believed there were three Utah prison inmates who had been convicted of murder and committed a second murder. Roe based his testimony not on any survey or study but on his memory. He couched his testimony in terms of "I think" or personal belief or memory.

4. On cross-examination, co-defense counsel, D. Gilbert Athay, expanded on Roe's testimony and asked for the names of the three recidivist murderers. Roe did not have any file or records of the individuals, but gave the names of three persons he believed had been repeat murderers. The names of the individuals were not asserted by Roe as being positive, but were stated as being based on the witness' memory.

5. No part of Roe's testimony was false as to his belief or memory. Roe's testimony was true as to the number of U.S.P. inmates, who had at that time, been convicted of murder and who had been released and convicted of a second murder. One other person had been convicted of manslaughter and then murder. Dr. Roe's testimony in this regard was not false or misleading.

6. Dr. Kay Gillespie, a Weber State College professor, cast doubt on Roe's testimony in a conversation with petitioner's counsel, several years after the trial concluded. Although not determined for a certainty, the preponderance of evidence is that Roe's memory as to the three inmates he named was not correct in that two of the inmates, Markham and St. Clair, had not committed a second murder. However, two other U.S.P. inmates not named by Roe had committed a second murder. The names of the inmates were not material to the proceedings and Dr. Roe's testimony as to his beliefs and memory was honest and accurate. The material testimony of Dr. Roe was not false in any particular.

7. The testimony of Dr. Roe at the penalty phase of petitioner's trial on the number of recidivating murderers was only a minor aspect of the evidence given during the penalty phase of petitioner's trial. It was significantly overshadowed by the overall length of evidence presented and the testimony of Dr. Smith as to capital murder recidivism. Roe's testimony on recidivism was a diminutive reference compared to the total testimony given at the

---

**40.** Two other inmates other than the four listed in Fisher's affidavit are Ed Schad who killed in Utah, *State v. Schad*, 24 Utah 2d 255, 470 P.2d 246 (1970), and then Arizona, *State v. Schad*, 129 Ariz. 557, 633 P.2d 366 (1981), after his release from U.S.P. and was sentenced to death. The second killing by Schad was after petitioner's trial. The second person was inmate Maestas whose record is unclear but it was not pertinent to the issue before the court.

penalty phase of petitioner's trial. The error in giving the names of second murderers was harmless beyond a reasonable doubt.

8. The testimony of Dr. Roe, as to the number of recidivating murderers at the U.S.P., was not significantly emphasized at closing argument. It was mentioned only once by the prosecutor and was a minor and inconsequential part of the prosecutor's argument and not the most significant part of Roe's evidence.

9. Counsel for petitioner did not unduly delay the presentation of the issue of any falsity as to Dr. Roe's testimony by raising it only in the instant petition.

*Discussion*

*Abuse of the Civil and Procedural Default*

There is no procedural default as to the issue of Dr. Roe's testimony since the Utah Supreme Court addressed the issue on the merits and found it to be governed by a standard of harmlessness. *Harris v. Reed,* supra.

Further, as to the issue of Dr. Roe's testimony there is no abuse of the writ. *Coleman v. Saffle,* supra. Neither the petitioner or counsel for petitioner had any real knowledge of the issue until Professor Kay Gillespie raised a question as to the accuracy of Dr. Roe's trial testimony. Although, the inferences of Gillespie that Roe's basic numbers were in error is not born out, counsel had no contrary knowledge until after discovery in this case. In this case the petition raises new and different grounds than those raised in the first petition for habeas corpus addressed by Judge Winder. Rule 9(a) *Rules Governing Section 2254 Cases,* is no bar to this issue. *Coleman v. Saffle,* supra.

On the issue itself it is without merit. There is no evidence of any prosecutorial misconduct by knowingly introducing false testimony. See *Alcorta v. Texas,* 355 U.S. 28, 31–32, 78 S.Ct. 103, 105, 2 L.Ed.2d 9

(1957) (knowing use of false testimony); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (knowing use of false testimony); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942) (use of perjured testimony and suppression of exculpatory evidence); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (false testimony, known to prosecutor, on whether there was nay consideration for the witness' testimony). In this case the prosecution had no knowledge of any falsity, although such knowledge is not required for relief to be afforded a petitioner.[41] However, in this case the evidence given by Dr. Roe as to the number of recidivist murders from the U.S.P. was not false, but true as to the tenor of the testimony and as to Dr. Roe's beliefs. It was also true in fact. Only the names of two individuals, brought out on cross-examination by co-defendant's counsel, were in error. This is not the kind of material false information that denies due process. See *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (prosecutor's evidence that paint was victim's blood is material).

In *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), a death penalty case, the court held the erroneous reference of a witness to a person named "Slick" and the failure of the prosecution to disclose other evidence on the issue was not "impeaching of positive" evidence (identification). Nor was evidence of a diagram significantly exculpatory to be material. The Supreme Court also held that the introduction of a shotgun not used in the killing was not a denial of due process. The evidence in *Moore* was of greater significance than that in this case and was not found to offend due process. It can only be concluded that any mistaken reference to the names or other inmates was harmless beyond a reasonable doubt.

In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) the

**41.** In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) the Supreme Court in a suppression of favorable material evidence case, where the prosecution withheld a statement of a co-defendant that he had committed the murder, held that the good or bad faith of

the prosecution was no longer material. See also *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In *Brady* the court described its rationale as an extension of the perjured testimony cases.

**1523**

court addressed the standard of materiality as being that the "omission [false evidence] is of sufficient significance to result in the denial of the defendant's right to a fair trial." It must be sufficient to create a reasonable doubt.[42] Evidence "highly probative of innocence" p. 107, was mentioned. Highly probative of culpability or the propriety of the death penalty would be of the same nature and dimension and the proper standard for review in this case. The "entire record" on sentencing must be examined. 427 U.S. at 107–13, 96 S.Ct. at 2399–402. In *Agurs* the evidence of a witness' prior record was held not to be of sufficient significance to be material and to warrant a new trial.[43] That case provides a strong basis for a finding of the non-materiality of the claim in this case.

In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) the court stated the standard of materiality to be "only if there is a reasonable probability that, had the evidence been disclosed ... the result of the proceeding would have been different." 473 U.S. at 684, 105 S.Ct. at 3385. The erroneous evidence must "undermine confidence in the outcome of the trial or in the case of the sentence. 473 U.S. at 678, 105 S.Ct. at 3381. There is no basis for such a conclusion in this case. The evidence of the inmates' names was not material, what was possibly of interest was the number of murderers.

In *Napue v. Illinois*, supra., the Supreme Court, in a perjured testimony case, held that federal courts were not bound by a state court's determination that false testimony "could not in any reasonable likelihood have affected the judgment of the jury." See also *United States v. Bagley*, supra, n. 8. In this case the issue of materiality and prejudice is a question of law and fact and this court is not bound by the Utah Supreme Court's determination of prejudice.[44] *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980);

*Summer v. Mata (Mata II)*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). See *Bowen v. Maynard*, 799 F.2d 593 (10th Cir.1986); *Chavez v. Brown*, 730 F.2d 1334 (10th Cir.1984). In *Bowen v. Maynard*, supra, the issue was a *Brady* issue of withholding of evidence. The court said:

Before we review the evidence to determine if a *Brady* violation occurred, we note that the question of materiality and the possible effect of the withheld evidence on the verdicts is a mixed question of fact and law. The state court's ultimate conclusion under *Brady* therefore is not entitled to a presumption of correctness under section 2254(d) and is open to review by federal courts.

In *Bowen v. Maynard*, supra, the court found a material withholding of critical evidence. In this case the circumstances are considerably dissimilar. In *Chavez v. Brown*, supra, the court held a state court determination on materiality was not a factual finding entitled to the presumption of correctness. However, the Utah Supreme Court's assessment is entitled to attention. *Miller v. Fenton*, supra. In this case where there was no real falsity, and only the names of successive murder inmates is in doubt, it must be considered that the evidence was not material and any falsity was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988). It could not have affected the sentence in this case. This is the necessary conclusion in light of the Supreme and Circuit Court cases considering this issue which have been previously canvassed. See also *United States v. Page*, 828 F.2d 1476, 1478 (10th

---

**42.** *Agurs*, of course, related to guilt. The court was expanding upon *Brady v. Maryland*, supra.

**43.** See also *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (failure to inform the trial judge that a juror had applied to the prosecutor's office for a job did not violate due process).

**44.** *Clemmons v. Mississippi*, —— U.S. ——, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) is not to the contrary. The case involved a state court weighing the aggravating and mitigating factors in a death case in the face of a valid and invalid aggravating circumstance.

Cir.1987) *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987).

At best the petitioner has presented some "impeaching" evidence on a collateral matter. This is insufficient for relief. *Lewis v. United States,* 771 F.2d 454, 456–57 (10th Cir.1985); *United States v. Ramsey,* 726 F.2d 601, 604 (10th Cir.1984); *United States v. Allen,* 554 F.2d 398, 403 (10th Cir.) *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977); *United States v. Maestas,* 523 F.2d 316 (10th Cir. 1975); *United States v. Franklin,* 704 F.2d 1183, 1192 (10th Cir.1983). This issue simply does not provide a proper basis for a claim that the sentence in this case was in anyway affected by any error in names used by Dr. Roe. The issue is insignificant. It does not provide a basis for this court to afford petitioner relief from his sentence under 28 U.S.C. § 2254. *Hopkinson v. Shillinger,* 866 F.2d 1185, 1212–1213 (10th Cir.1989); *United States v. Ramsey,* 802 F.2d 393, 394–95 (10th Cir.1986); *United States v. Van Daal Wyk,* 840 F.2d 494, 500 (7th Cir.1988).

*Conclusion*

The supplemental petition of William Andrews claims a violation of his constitutional rights by the prosecution's exercise of a peremptory challenge against the only black member of the prospective jury panel. Petitioner has shown no violation of his constitutional right on that issue. Nor, has petitioner shown any violation of his constitutional right to a fair trial from the testimony of Dr. Allen Roe.

Consequently, the petition for habeas corpus of William Andrews should be denied. IT IS SO RECOMMENDED.